1  **SARA M. PELQOUIN**
   California State Bar No. 254945
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California  92101-5008
   Telephone:  (619) 234-8467, ext. 3716

4

5  Attorneys for Mr. Rivera

6

7

8                      UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                    **(HONORABLE LARRY A. BURNS)**

11  UNITED STATES OF AMERICA,          )    CASE NO. 08CR1453-LAB
                                       )
12              Plaintiff,             )    DATE:      June 30, 2008
                                       )    TIME:      2:00 P.M.
13  v.                                 )
                                       )    STATEMENT OF FACTS AND
14  DAVID RIVERA,                      )    MEMORANDUM OF POINTS AND
                                       )    AUTHORITIES IN SUPPORT OF MR.
15              Defendant.             )    RIVERA'S MOTIONS
    _____)

16

17                                  **I.**

18                          **STATEMENT OF FACTS**[1]

19          On April 28, 2008, Mr. Rivera was walking alone along Highway 94, when he was approached by

20  Agent Matta.  Mr. Rivera was approximately one mile North of the United States- Mexico Border. There

21  is no allegation that Agent Matta was responding to a citizen report, seismic sensor or any other Border

22  Patrol intelligence that a suspected illegal alien was traveling on foot along Highway 94.  Nevertheless,

23  Agent Matta stopped, and interrogated Mr. Rivera regarding his immigration status and his country of

24  citizenship.  It is undisputed that Mr. Rivera was not advised of his *Miranda* rights prior to this

25

26  _____

27  [1] The following statement of facts is based on materials received from the government.  Mr.
    Samaniego-Canto does not accept this statement of facts as his own, and reserves the right to take a
    contrary position at motion hearings and trial.  The facts alleged in these motions are subject to
28  amplification and/or modification at the time these motions are heard.

interrogation.  Mr. Rivera is alleged to have made inculpatory statements regarding his alienage and immigration status.  Mr. Rivera was then transported to the Tecate Processing Center.  There, Agent Diego informed Mr. Rivera of his *Miranda* rights.  Mr. Rivera did not understand his rights.  He agreed to talk to the agents without a lawyer present.  He is alleged to have made inculpatory statements about his alienage and immigration history.

## II.

## MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

Mr. Rivera  moves for the production of the following discovery.  This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies."  See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

(1)  Mr. Rivera's Statements.  The government must disclose to Mr. Rivera all copies of any written or recorded statements made by him; the substance of any statements made by Mr. Rivera which the government intends to offer in evidence at trial -- either in its case-in-chief or in rebuttal; see Id., any response by him to interrogation; the substance of any oral statements which the government intends to introduce at trial and any written summaries of Mr. Rivera's oral statements contained in the handwritten notes of the government agent; any response to any Miranda warnings which may have been given to him; as well as any other statements by Mr. Rivera.  Fed. R. Crim. P. 16(a)(1)(A)[2].  Mr. Rivera specifically requests production of a copy of the taped proceedings and any and all documents memorializing the deportation proceedings allegedly held and any other proceedings that the government intends to rely upon at trial.  The Advisory Committee Notes and the 1991 Amendments to Rule 16 make clear that the Government must reveal all the accused's statements, whether oral or written, regardless of whether the government intends to make any use of those statements.  Federal Rule of Criminal Procedure 16 is designed "to protect the defendant's rights to a fair trial."  United States v. Rodriguez, 799 F.2d 649 (11th Cir. 1986); see also United States v. Noe, 821 F.2d 604, 607 (11th Cir. 1987) (reversing conviction for

---

[2]  Of course, any of Mr. Rivera's statements, which are exculpatory, must be produced, as well.  See Brady v. Maryland, 373 U.S. 83 (1963).

08CR1453-LAB

1  failure to provide statements offered in rebuttal -- government's failure to disclose statements made by the

2  defendant is a serious detriment to preparing trial and defending against criminal charges).

3      (2)  <u>Arrest Reports and Notes</u>.  Mr. Rivera also specifically requests that the government turn

4  over all arrest reports, notes and TECS records not already produced that relate to the circumstances

5  surrounding his arrest or any questioning.  This request includes, but is not limited to, any rough notes,

6  records, reports, transcripts, referral slips, or other documents in which statements of Mr. Rivera or any

7  other discoverable material is contained.  Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A)

8  and <u>Brady v. Maryland</u>.  The government must produce arrest reports, investigators' notes, memos from

9  arresting officers, sworn statements, and prosecution reports pertaining to the defendant.  <u>See</u> Fed. R.

10  Crim. P. 16(a)(1)(B) and (C), 26.2 and 12(I); <u>United States v. Harris</u>, 543 F.2d 1247, 1253 (9th Cir. 1976)

11  (original notes with suspect or witness must be preserved); <u>see also</u> <u>United States v. Anderson</u>, 813 F.2d

12  1450, 1458 (9th Cir. 1987) (reaffirming <u>Harris</u>' holding).

13      (3)  <u>Brady Material</u>.  Mr. Rivera requests all documents, statements, agents' reports, and tangible

14  evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the

15  government's case.  <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995).  Under <u>Brady</u>, <u>Kyles</u> and their progeny,

16  impeachment, as well as exculpatory evidence, falls within the definition of evidence favorable to the

17  accused.  <u>See also</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97

18  (1976).  This includes information obtained from other investigations which exculpates Mr. Rivera.

19      (4)  <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>.  The

20  government must also produce this information under <u>Brady v. Maryland</u>.  This request includes any

21  cooperation or attempted cooperation by Mr. Rivera, as well as any information, including that obtained

22  from other investigations or debriefings, that could affect any base offense level or specific offense

23  characteristic under Chapter Two of the Guidelines.  Mr. Rivera also requests any information relevant

24  to a Chapter Three adjustment, a determination of his criminal history, and information relevant to any

25  other application of the Guidelines.

26      (5)  <u>Mr. Rivera's Prior Record</u>.  Mr. Rivera requests disclosure of his prior record.

27  Fed. R. Crim. P. 16(a)(1)(D).

28

1    (6)    <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior similar

2    acts under Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609.  In addition, "upon request of

3    the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general

4    nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial and the

5    purpose for which introduction is sought.  This applies not only to evidence which the government may

6    seek to introduce in its case-in-chief, but also to evidence which the government may use as rebuttal.  <u>See</u>

7    <u>United States v. Vega</u>, 188 F.3d 1150 (9th Cir. 1999).  Mr. Rivera is entitled to "reasonable notice" so as

8    to "reduce surprise," preclude "trial by ambush" and prevent the "possibility of prejudice."  <u>Id.</u>; <u>United</u>

9    <u>States v. Perez-Tosta</u>, 36 F.3d 1552, 1560-61 (11th Cir. 1994).  Mr. Rivera requests such reasonable notice

10   at least two weeks before trial so as to adequately investigate and prepare for trial.

11   (7)    <u>Evidence Seized</u>.  Mr. Rivera requests production of evidence seized as a result of any

12   search, either warrantless or with a warrant.  Fed. R. Crim. P. 16(a)(1)(E).

13   (8)    <u>Request for Preservation of Evidence</u>.  Mr. Rivera specifically requests the preservation

14   of any and all physical evidence that may be destroyed, lost, or otherwise put out of the possession,

15   custody, or care of the government and which relates to the arrest or the events leading to the arrest in this

16   case.  This request includes, but is not limited to, the results of any fingerprint analysis, Mr. Rivera's

17   personal effects, and any evidence seized from Mr. Rivera or any third party in relation to this case.

18   In addition, Mr. Rivera requests that the Assistant United States Attorney assigned to this case

19   oversee a review of all personnel files of each agent involved in the present case for impeachment material.

20   <u>Kyles</u>, 514 U.S. at 419; <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991); <u>United States v. Lacy</u>, 896

21   F.Supp. 982 (N.D. Ca. 1995).  At a minimum, the prosecutor has the obligation to inquire of his agents

22   in order to ascertain whether or not evidence relevant to veracity or other impeachment exists.

23   (9)    <u>Tangible Objects</u>.  Mr. Rivera requests the opportunity to inspect and copy, as well as test,

24   if necessary, all other documents and tangible objects, including photographs, books, papers, documents,

25   fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended

26   for use in the government's case-in-chief or were obtained from or belong to Mr. Rivera.  Fed. R. Crim.

27   P. 16(a)(1)(E).  Specifically, to the extent they were not already produced, Mr. Rivera requests copies of

28

all photographs in the government's possession, including, but not limited to, photographs of himself and

any other photos taken in connection with this case.

(10) <u>Expert Witnesses</u>. Mr. Rivera requests the name, qualifications, and a written summary

of the testimony of any person that the government intends to call as an expert witness during its case in

chief. Fed. R. Crim. P. 16(a)(1)(G). The defense requests that notice of expert testimony be provided at

a minimum of two weeks prior to trial so that the defense can properly prepare to address and respond to

this testimony, including obtaining its own expert and/or investigating the opinions and credentials of the

government's expert. The defense also requests a hearing in advance of trial to determine the admissibility

of qualifications of any expert. <u>See</u> <u>Kumho v. Carmichael Tire Co.</u> 119 S. Ct. 1167, 1176 (1999) (trial

judge is "gatekeeper" and must determine reliability and relevancy of expert testimony and such

determinations may require "special briefing or other proceedings . . ..").

(11) <u>Evidence of Bias or Motive to Lie</u>. Mr. Rivera requests any evidence that any prospective

government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his

or her testimony.

(12) <u>Impeachment Evidence</u>. Mr. Rivera requests any evidence that any prospective government

witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness

has made a statement favorable to the defendant. <u>See</u> Fed. R. Evid. 608, 609 and 613; <u>Brady v. Maryland</u>.

(13) <u>Evidence of Criminal Investigation of Any Government Witness</u>. Mr. Rivera requests any

evidence that any prospective witness is under investigation by federal, state or local authorities for any

criminal conduct.

(14) <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling</u>.

The defense requests any evidence, including any medical or psychiatric report or evaluation, that tends

to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is

impaired, and any evidence that a witness has ever used narcotics or other controlled substance, or has ever

been an alcoholic.

(15) <u>Jencks Act Material</u>. Mr. Rivera requests production in advance of trial of all material,

including any tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500;

Fed. R. Crim. P. 26.2. Advance production will avoid the possibility of delay at Mr. Rivera's request to

investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963); see also United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (holding that, where an agent goes over interview notes with subject, interview notes are subject to Jencks Act).

(16) Giglio Information. Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Rivera requests all statements and/or promises, express or implied, made to any government witnesses, in exchange for their testimony in this case, and all other information which could arguably be used for the impeachment of any government witnesses.

(17) Agreements Between the Government and Witnesses. In this case, Mr. Rivera requests identification of any cooperating witnesses who have committed crimes, but were not charged, so that they may testify for the government in this case. Mr. Rivera also requests discovery regarding any express or implicit promise; understanding; offer of immunity; past, present, or future compensation; or any other kind of agreement or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability between any prospective government witness and the government (federal, state and/or local). This request also includes any discussion with a potential witness about, or advice concerning, any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed.

Pursuant to United States v. Sudikoff, 36 F.Supp.2d 1196 (C.D. Cal. 1999), the defense requests all statements made, either personally or through counsel, at any time, which relate to the witnesses' statements regarding this case, any promises -- implied or express -- regarding punishment/prosecution or detention of these witnesses, any agreement sought, bargained for or requested, on the part of the witness at any time.

(18) Informants and Cooperating Witnesses. Mr. Rivera requests disclosure of the names and addresses of all informants or cooperating witnesses used, or to be used, in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Rivera. The government must disclose the informant's identity and location, as well as the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v. United

States, 353 U.S. 53, 61-62 (1957). The government must disclose any information derived from informants which exculpates or tends to exculpate Mr. Rivera.

(19) Bias by Informants or Cooperating Witnesses. Mr. Rivera requests disclosure of any information indicating bias on the part of any informant or cooperating witness. Giglio v. United States. Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

(20) Inspection and Copying of A-File. Mr. Rivera requests that this Court order the government to make all A-Files relevant to Mr. Rivera available for inspection and copying. Mr. Rivera requests a full copy of his A-file and any other immigration files linked to his immigration history. Mr. Rivera specifically requests the documents memorializing the alleged deportation proceedings and any other proceedings that the government intends to rely upon at trial.

Mr. Rivera additionally requests that the Court order the government to allow him the opportunity to review his A-file in its entirety. First, the A-file contains documentation concerning his alleged deportation. Mr. Rivera must be afforded the opportunity to challenge the validity of the indictment. Mr. Rivera may do this by challenging the lawfulness of the alleged deportation. The documents in the A-file are essential to a potential challenge to the indictment and the lawfulness of the deportation.

Second, the government will likely try to show at trial that a government officer searched the A-file and did not find an application by Mr. Rivera for permission to enter the United States. Mr. Rivera anticipates that the government will attempt to admit a "Certificate of Non-Existence of Record" against him, arguing that if Mr. Rivera had ever applied for permission to enter the United States, such an application would be found in the A-file and because such an application is not in the A-file, Mr. Rivera must not have applied for permission to enter the United States.

Although the certificate might be admissible, the question of the thoroughness of the search conducted by the government of the A-file is, and should be, open to cross-examination. United States v. Sager, 227 F.3d 1138, 1145 (2000) (error not to allow jury to "grade the investigation."). Mr. Rivera should be able to review his A-file in order to see whether any application for lawful admission exists. Moreover, Mr. Rivera should also be able to verify whether other documents that would ordinarily be in

the A-file are "non-existent," or otherwise missing from his A-file. Mr. Rivera may assert a defense that his application for lawful entry was lost or otherwise misplaced by the government. He must be allowed the opportunity to review his A-file and the manner in which it is being maintained by the government in order to present this defense.

Finally, the A-File may contain <u>Brady</u> material. Mr. Rivera requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case. <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995). Under <u>Brady</u>, <u>Kyles</u> and their progeny, impeachment, as well as exculpatory evidence, falls within the definition of evidence favorable to the accused. <u>See also</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976). This includes information obtained from other investigations which exculpates Mr. Rivera.

Brady material also includes and information that may lead to a lower sentence under the guidelines. The A-File is likely to contain documents from alleged prior conviction that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines. Mr. Rivera also requests any information relevant to a Chapter Three adjustment, a determination of his criminal history, and information relevant to any other application of the Guidelines.

The A-File is likely to contain information regarding prior similar acts. The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609. In addition, "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial and the purpose for which introduction is sought. This applies not only to evidence which the government may seek to introduce in its case-in-chief, but also to evidence which the government may use as rebuttal. <u>See</u> <u>United States v. Vega</u>, 188 F.3d 1150 (9th Cir. 1999). Mr. Rivera is entitled to "reasonable notice" so as to "reduce surprise," preclude "trial by ambush" and prevent the "possibility of prejudice." <u>Id.</u>; <u>United States v. Perez-Tosta</u>, 36 F.3d 1552, 1560-61 (11th Cir. 1994). Mr. Rivera requests such reasonable notice at least two weeks before trial so as to adequately investigate and prepare for trial.

08CR1453-LAB

(21)  Residual Request.  Mr. Rivera intends, by this discovery motion, to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.  Mr. Rivera requests that the government provide his attorney with the above-requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination

## III.

### THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. SAMANIEGO-CANTO OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY

### A.    Introduction.

The indictment in the instant case was returned by the January 2007 grand jury.  See CR at 6.[3] That grand jury was instructed by Judge Burns on January 11, 2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[4]  These instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[5]

///

///

---

[3]  "CR" refers to the Clerk's Record in Case Number 07CR2364-LAB.

[4]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[5]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury.  Mr.Rivera requests that the video presentation be produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

08CR1453-LAB

**1.      Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, <u>see</u> Ex. A at 3, 3-4, 5,[6] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." <u>See id.</u> at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which it excused three potential jurors.  <u>See</u> <u>id.</u> at 8.

> I've gone over this with a couple of people.  You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

<u>Id</u>.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress.  <u>See id.</u> at 8-9.  Thus, the Court not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

 Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

---

[6]  <u>See also</u> <u>id.</u> at 20 ("You're all about probable cause.").

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing is Judge Burns's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause.  Because of the redactions of the grand jurors' names, Mr. Arredondo-Ortiz will refer to them by occupation.  One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration cases.  See id.

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.  Rather, Judge Burns provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment.  If there's probable cause, then the case should go forward.  *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that is your frame of mind, the probably you shouldn't serve.  Only you can tell me that.

08CR1453-LAB

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that it would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See id. Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question provided no context; it inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id. That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."

You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.

That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
REA: It would depend on the case.
The Court: Is there a chance that you would do that?
REA: Yes.
The Court: I appreciate your answers. I'll excuse you at this time.

Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor

1  of the case going forward."[7]  See id. at 27.  That is why even the "chance," see id., that a grand juror might

2  not vote to indict was too great a risk to run.

3       **2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

4

5       In addition to his instructions on the authority to choose not to indict, Judge Burns also assured

6  the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.

7  See Ex. A at 20.[8]

8            Now, again, this emphasizes the difference between the function of the
            grand jury and the trial jury.  You're all about probable cause.  If you think
9            that there's evidence out there that might cause you to say "well, I don't
            think probable cause exists," then it's incumbent upon you to hear that
10           evidence as well.  As I told you, in most instances, *the U.S. Attorneys are*
            *duty-bound to present evidence that cuts against what they may be asking*
11           *you to do if they're aware of that evidence.*

12

13      Id. (emphasis added).

14

15

16      [7]  This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will have
determined the existence of probable cause "in most circumstances" before it has been presented with any evidence.  See Ex.
17  A at 6.  This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so
found, the case likely would not have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed
18  that it merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction made the grand jury
more inclined to indict irrespective of the evidence presented.

19      [8]  These instructions were provided in the midst of several comments that praised the United States attorney's office
and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will
20  appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."
See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who
21  revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively
endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it:  "frankly, I agree
22  with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a
presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to
23  indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").
        Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent
24  in his praising of the government attorneys.  See Ex. A at 9-10.  Judge Burns's instructions implied that as a prior prosecutor
and current "jury liaison judge," see id. at 8, Judge Burns would not allow the government attorneys to act inappropriately or
25  to present cases for indictment where no probable cause existed.
        In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's
26  instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S.
Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand
27  jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors."  Navarro-Vargas, 408
F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts
28  regularly presume grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume
that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they
understood the instruction as given and then followed it.").

08CR1453-LAB

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

### B. Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[9] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).

---

[9]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit. But not in Judge Burns's instructions.

### C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established in Both Vasquez and Navarro-Vargas II.

The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its

previous decision in <u>Marcucci</u>. <u>Marcucci</u> reasoned that the instructions do not mandate that grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). <u>See also</u> <u>id</u>. ("The 'word' should is used to express a duty [or] obligation.") (quoting <u>The Oxford American Diction and Language Guide</u> 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." <u>See</u> Ex. A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." <u>Vasquez</u>, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, <u>see</u> Ex. B at 4, 8, in context, it is clear that Judge Burns could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, it told them that if there is not probable cause, "then the grand jury should hesitate and not indict." <u>See</u> <u>id</u>. at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1205. Clearly Judge Burns was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a

reasonable belief that the person that they propose that we indict committed the crime?"

If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if Judge Burns said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then Judge Burns would have to have intended two different meanings of the word "should" in the space of two consecutive sentences.  That could not have been his intent.  But even if it were, no grand jury could ever have had that understanding.[10]  Jurors are not presumed to be capable of sorting through internally contradictory instructions.  See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

**(1)**   The first occasion occurred in the following exchange when Judge Burns conducted voir dire and excused a potential juror (CSW):

---

[10]  This argument does not turn on Mr. Rivera's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

The Court: . . . If there's probable cause, then the case should go forward.
I wouldn't want you to say, "Well, yeah, there's probable cause. But I still
don't like what the government is doing. I disagree with these laws, so I'm
not going to vote for it to go forward." If that's your frame of mind, then
probably you shouldn't serve. Only you can tell me that.
Prospective Juror: Well, I think I may fall in that category.
The Court: In the latter category?
Prospective Juror: Yes.
The Court: Where it would be difficult for you to support a charge even if
        you thought the evidence warranted it?
Prospective Juror: Yes.
The Court: I'm going to excuse you then.

See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with

a prospective juror.  Even if the prospective juror did not like what the government was doing in a

particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that

might prevent that.  See id. ("I wouldn't want you [to vote against such a case]").  The sanction for the

possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's

discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.


**(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that

it there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other

prerogative.

Court        . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

You'd have a similar *obligation* as a grand juror even though you might
have to grit your teeth on some cases.  Philosophically, if you were a
member of Congress, you'd vote against, for example, criminalizing
marijuana. I don't know if that's it, but you'd vote against criminalizing
some drugs.

That's not what your *prerogative* is here.  Your prerogative instead is act
like a judge and to say, "All right.  This is what I've got to deal with
objectively.  Does it seem to me that a crime was committed?  Yes.  Does
it seem to me that this person's involved?  It does." *And then your
obligation, if you find those things to be true, would be to vote in favor of
the case going forward.*

Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and

prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even

though you were convinced there was probable cause they committed a drug offense?" Id. at 27.  The

potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

**(3)** As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

**(4)** And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court: In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court: Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things.*

> *We'd ask you to also abide by that.* We want you to make a business-like
> decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized consideration of penalty information. See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in Vasquez:

> The grand jury does not determine only that probable cause exists to believe
> that a defendant committed a crime, or that it does not. In the hands of the
> grand jury lies the power to charge a greater offense or a lesser offense;
> numerous counts or a single count; and perhaps most significant of all, a
> capital offense or a non-capital offense – all on the basis of the same
>
> facts. Moreover, "[t]he grand jury is not bound to indict in every case
> where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent structural constitutional error "that interferes with the grand jury's

1    independence and the integrity of the grand jury proceeding." See United States v. Isgro, 974 F.2d 1091,

2    1094 (9th Cir. 1992). The indictment must therefore be dismissed. Id.

3        The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

4    instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

5    independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

6    decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may

7    have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

8    independent." Id. at 1202 (emphases in the original).

9        Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

10    'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and

11    unreviewability of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins,

12    J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power

13    to do anything beyond making a probable cause determination ... unconstitutionally undermines the very

14    structural protections that the majority believes save[] the instruction." Id. After all, it is an "'almost

15    invariable assumption of the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh,

16    481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors could

17    not possibly fulfill the role described in Vasquez. Indeed, "there is something supremely cynical about

18    saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey

19    them." Id.

20        In setting forth Judge Hawkins' views, Mr.Rivera understands that Judge Burns may not adopt

21    them solely because the reasoning that supports them is so much more persuasive than the majority's

22    sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

23        Here, again, the question is not an obscure interpretation of the word "should", especially in light

24    of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for

25    by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute

26    ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez,

27    Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but

28    not only that.

1       Judge Burns did not limit itself to denying the grand jurors the power that <u>Vasquez</u> plainly

2   states they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth

3   Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that]

4   principle...."  <u>See</u> Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its

5   deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their

6   willingness to act as the conscience of the community.  See <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11

7   (Hawkins, J., dissenting) (a grand jury exercising its powers under <u>Vasquez</u> "serves ... to protect the

8   accused from the other branches of government by acting as the 'conscience of the community.'") (quoting

9   <u>Gaither v. United States</u>, 413 F.2d 1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only

10  "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," <u>United States v.</u>

11  <u>Williams</u>, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned his own rules and enforced

12  them.

13          **D.     The Instructions Conflict with Williams' Holding That There Is No Duty to Present**
                    **Exculpatory Evidence to the Grand Jury.**
14

15          In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,

16  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

17  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

18  common law.  <u>See</u> 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such

19  'supervisory' judicial authority exists."  <u>See id</u>. at 47.  Indeed, although the supervisory power may provide

20  the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that

21  misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and

22  approved by Judge Burns and by Congress to ensure the integrity of the grand jury's functions,'" <u>id</u>. at 46

23  (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in

24  the first instance."  <u>Id</u>. at 47 (emphasis added).  The federal courts possess only "very limited" power "to

25  fashion, on their own initiative, rules of grand jury procedure."  <u>Id</u>. at 50.  As a consequence, Williams

26  rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common

27  law.  <u>See id</u>. at 51-55.

28

Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can

expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.

(2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## IV.

### ALL EVIDENCE DERIVED FROM THE STOP OF MR. RIVERA SHOULD BE SUPPRESSED BECAUSE THE STOP WAS UNSUPPORTED BY REASONABLE SUSPICION IN VIOLATION OF THE FOURTH AMENDMENT.

**A. Agent Matta Lacked Reasonable Suspicion to Stop Mr. Rivera.**

The Fourth Amendment protects individuals from unreasonable searches and seizures by government agents. Although, by its text, the Fourth Amendment requires probable cause to justify the arrest of an individual, the Supreme Court has approved seizures of limited duration and scope based upon a reasonable suspicion that criminality is afoot. Terry v. Ohio, 391 U.S. 1 (1968). Border Patrol Agents do not have the unfettered right to approach any person near the border to inquire regarding citizenship and immigration status. Rather, they are bound by the Fourth Amendment requirement that they have specific and articulable facts rising to a particularized suspicion that the person to be questioned is an illegal alien.

1    United States v. Brignoni-Ponce, 422 U.S. 873 (1975); United States v. Manzo-Jurado, 457 F.3d 928 (9th

2    Cir. 2006); United States v. Montero-Camargo, 208 F.3d 1122.

3         The existence of reasonable suspicion is evaluated under the totality of the circumstances.  Terry

4    v. Ohio, 391 U.S. 1; United States v. Arvizu, 534 U.S. 266; United States v. Montero-Camargo, 208 F.3d

5    1122 (9th Cir. 2000).  Various factors have been  taken into consideration when evaluating the existence

6    of reasonable suspicion to stop and enquire regarding alienage and immigration status, including: proximity

7    to the border; notoriety of the area for alien smuggling activity; and, the suspicious or evasive conduct of

8    the person stopped.  United States v. Brignoni-Ponce, 422 U.S. 873; United States v. Manzo-Jurado, 457

9    F.3d 928; United States v. Montero-Camargo, 208 F.3d 1122.

10        The Arvizu case demonstrates how the totality of the circumstances can rise to the level of

11   reasonable suspicion.  534 U.S. at 277.  In Arvizu, the agent articulated the following facts:

12        1.    a magnetic sensor alerted the agent to the presence of a vehicle on an
              unpaved, seldom traveled road used by smugglers to avoid Border Patrol
13            checkpoints, Arvizu, at 268;

      2.    the sensor alert occurred during a change in shifts which would leave the
14            area unpatrolled by the agents, Id.;

      3.    the same sensor had detected a minivan using the same route several weeks
15            before which resulted in a marijuana seizure, Id., at 269-270;

      4.    a second sensor signal indicated to the agent that the vehicle had turned onto
16            another unpaved road on a route commonly used to circumvent checkpoints,
              Id., at 270;

17        5.    when the agent intercepted the vehicle, it turned out to be a minivan, Id.;

      6.    when the agent followed the minivan, he noted that the occupants, who
18            appeared to be a family, behaved strangely, first ignoring him and then
              waving in a mechanical manner, Id., at 270-271;

19        7.    the agent could see the children's knees, which indicated that their feet rested
              on some cargo. Id., at 270;

20        8.    the van turned onto a third, even rougher unpaved road, away from any
              checkpoint, and away from any destination a family might want to reach for
21            recreation, Id., at 271; and

      9.    a radio check by the agent indicated that the minivan was registered to an
22            address four miles from the international border in a neighborhood notorious
              for smuggling activity, Id., at 271.

23
24   As a result, the agent in Arvizu had reasonable suspicion to perform an investigatory stop of the minivan

25   because he could:

26        infer from his observations, his registration check, and his experience that ... [the minivan]
         had set out ... along a little-traveled route used by smugglers to avoid the ... checkpoint[s] ...
27        at a time when officers would be leaving their ... shifts ... on unpaved and primitive roads.

28   Arvizu, 534 U.S. at 277.

In this case, the totality of the circumstances do not rise to a particularized suspicion that Mr. Rivera was an illegal alien.  The encounter in question occurred two miles from the international border on a highway.  Although this is not an extensive distance from the border, it certainly does not lead to an inevitable conclusion of a recent crossing, the way an encounter mere yards from the border fence might suggest.  Agent Matta did not report any Border Patrol intelligence suggesting the presence of a suspected illegal alien in the area.  Agent Matta relies on the assertion that Mr. Rivera appeared lost and tired.  Agent Matta asserts in his report that he initially passed by Mr. Rivera but then changed his mind and decided to approach him out of concern for his health and safety, not out of suspicion that Mr. Rivera had illegally entered the United States.  However, Agent Matta does not assert any facts that caused his initial concern for health and safety to change to reasonable suspicion of illegal activity.

The mere presence of a pedestrian, by the side of a highway, close to the border does not amount to reasonable suspicion that the person is an illegal alien.  Thus, the stop violated the Fourth Amendment and any statements obtained must be suppressed.  At minimum, the Court should grant an evidentiary hearing to test the basis of Agent Matta's suspicion.

**B.      The Court Should Suppress All Evidence Derived from the Illegal Stop, Including Mr. Rivera's Statements, Fingerprints and A-File Documents.**

The Court must suppress all evidence obtained by the government as a result of the illegal stop, including Mr. Rivera's fingerprints and other evidence acquired by the government as a result of taking Mr. Rivera's fingerprints.  See United States v. Garcia-Beltran, 389 F.3d 864 (9th Cir. 2004) (noting that evidence unlawfully seized during the course of a criminal investigation, that tends to establish identity, should be suppressed).

Although a person may be compelled to appear in court, despite the fact that the person was arrested in violation of the Fourth Amendment, INS v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984), fingerprints and other evidence obtained as a result of the illegal arrest must be suppressed.  See Davis v. Mississippi, 389 U.S. 721 (1969) ("Our decisions recognize no exception to the rule that illegally seized evidence is inadmissible at trial. . .  Fingerprint evidence is no exception to this comprehensive rule.").  See also Hayes v. Florida, 470 U.S. 811 (1985) (noting that "[n]one of our later cases have undercut the holding in Davis...").

1    In Garcia-Beltran, the Ninth Circuit explained this crucial distinction. See Garcia-Beltran, 389 F.3d

2    at 866.  Mr. Garcia-Beltran, unlike the person in Lopez-Mendoza, recognized that he could be lawfully

3    compelled to appear in court, but "sought to exclude evidence obtained from him as a result of his illegal

4    arrest, including evidence that would tend to establish his true identity, such as fingerprints, photographs

5    and oral statements." Id. at 867.   The Ninth Circuit held that "[c]ontrary to the government's argument,

6    Lopez-Mendoza does not preclude suppression of evidence unlawfully obtained from a suspect that may

7    in a criminal investigation establish the identity of the suspect." Id. at 867.  In particular, the Ninth Circuit

8    noted fingerprints taken for an investigatory purpose should be suppressed. Id. at 868 ("Thus, on remand,

9    if the evidence were to show that as a consequence of the illegal arrest of Garcia-Beltran, law enforcement

10    officials obtained his fingerprints to pursue a criminal immigration law violation, the fingerprints would

11    be subject to suppression unless they were obtained by 'means sufficient to have purged the taint of the

12    initial illegality.'") (quoting United States v. Guevara-Martinez, 262 F.3d 751, 755 (8th Cir. 2001).

13    Mr. Rivera, like Mr. Garcia-Beltran recognizes that he may lawfully be compelled to appear in

14    court, however, he objects to the use of any and all evidence obtained from him as a result of his illegal

15    arrest, including evidence that would tend to establish his true identity, such as fingerprints, photographs,

16    oral statements, and immigration documents and files connected to him based on fingerprints, photographs

17    and oral statements taken from him at the time of his arrest. Id. at 866-67.

18    The Ninth Circuit in United States v. Ortiz-Hernandez, re-affirmed that fingerprints taken as a result

19    of an arrest in violation of the Fourth Amendment must be suppressed. 427 F.3d 567, 576 (9th Cir. 2005).

20    However, the court upheld the taking of a subsequent fingerprint exemplar for use at trial reasoning that

21    the second set of fingerprints were not for investigatory purposes and therefore not subject to Fourth

22    Amendment protections. Id., at 577.  Mr. Rivera disagrees that a subsequent fingerprint exemplar is not for

23    investigatory purposes as the taking of such an exemplar would be for the purposes of a continuing pre-trial

24    investigation of charges brought in response to Mr. Rivera's unconstitutional arrest.

25    "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either

26    during or as a direct result of an unlawful invasion."   Wong Sun, 371 U.S. at 485.  It also prohibits

27    introduction of testimony concerning knowledge acquired during an unlawful search or arrest.  See

28    Silverman v. United States, 365 U.S. 505 (1961).  "The essence of a provision forbidding the acquisition

of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." Wong Sun, 371 U.S. at 485 (quoting Silverthorne Lumber Co., Inc. v. United States, 251 U.S. 385, 392 (1920)).

Unless evidence is gained on the basis of information wholly unconnected with the initial unlawful search or arrest, it must be suppressed. See Murray, 487 U.S. at 540. Evidence does not come from a genuinely independent source if the agents' decision to seek a warrant was prompted by what they learned or saw during a prior unlawful entry into a building. Id. at 483-84. Moreover, it is the government's burden to prove that no information gained from an illegal search affected either the law enforcement officer's decision to seek a warrant or the magistrate judge's decision to grant it. Id. at 540. Logically, therefore, it must also be the government's burden to prove that no information gained from Mr. Rivera's illegal seizure affected the government's decision to fingerprint him or search his A-file. This is no less true with regard to the fingerprint exemplars that the government now seeks than it is with regard to the fingerprints taken at the time of his arrest.

The burden on the government is substantial. For example, in United States v. Padilla, 960 F.2d 854 (9th Cir. 1989), overruled on other grounds, 508 U.S. 77 (1993), the Ninth Circuit stated evidence obtained as the result of an illegal stop must be suppressed unless the leads were so insubstantial that their role in the discovery of the evidence must be considered *de minimus*. Id. at 862 (quoting United States v. Johns, 891 F.2d 243, 245 (9th Cir. 1989). In Padilla, an individual was illegally stopped. After obtaining consent to search his car, officers found 560 pounds of cocaine concealed in the trunk. Id. at 856. The officers also learned that the car was registered to Mr. Simpson, a customs official. Id. When questioned, the individual who had been illegally stopped implicated Mr. Simpson, the customs official. Id. at 857. The district court suppressed all evidence against Mr. Simpson (and other defendants). Id. at 858. The government appealed. Id.

On appeal, the Ninth Circuit found that the district court properly suppressed all evidence against Mr. Simpson because there was a direct link between the illegal stop and the evidence against him. Id. at 862. For example, the documents before the district court indicated that the reason for the investigation of Mr. Simpson was because his vehicle was apprehended in a drug seizure. Id. The Ninth Circuit emphasized that there was no indication that the informant would have would have come forward on his

1  own accord. Id. at 863. Thus, the identity of Mr. Simpson would not have been known absent the prior

2  illegal arrest of the informant. Id.

3      Similarly, the government's decision to seek Mr. Rivera's fingerprints is clearly based upon

4  information obtained as a result of his illegal arrest. Prior to Mr. Rivera's arrest, the government had no

5  knowledge that Mr. Rivera was within the United States or, looking at him, that he is a deported alien.

6  Because the government cannot show that it is not relying on information obtained as a result of the illegal

7  arrest, the Court should prohibit the government from taking Mr. Rivera's fingerprints and exclude any such

8  evidence at trial.

9      To prohibit the government from taking Mr. Rivera's fingerprints would not put the government

10  in any worse position than they were in prior to the unlawful stop. See Murray, 487 U.S. at 542 (noting that

11  the policy behind the independent source doctrine is that "while the government should not profit from its

12  illegal activity, neither should it be placed in a worse position than it would otherwise have occupied").

13  Conversely, to permit the government to introduce documents from Mr. Rivera's A-file, knowledge of

14  which it obtained by way of his illegal arrest, would be to permit the government to "avail itself of the

15  knowledge obtained by that means which it otherwise would not have had." Silverthorne Lumber Co., Inc.,

16  251 U.S. at 391. "The knowledge gained by the Government's own wrong cannot be used by it in the way

17  proposed." Id. at 392.

18      The government should also be prohibited from introducing documents obtained from Mr. Rivera's

19  A-file. Absent the questioning and fingerprinting of Mr. Rivera, which resulted from the unconstitutional

20  stop, the government would not know that he is a deported alien and that the documents in his A-file are

21  connected to him. The A-file documents the government seeks to admit at trial against Mr. Rivera are not

22  from a genuinely independent source of information. The government's decision to search his A-file and

23  attempt to connect him, via fingerprints and photographs, to the documents in the A-file was clearly

24  prompted by what the agents learned when they stopped Mr. Rivera. Therefore, the government should not

25  be permitted to fingerprint Mr. Rivera now or introduce any documents, such as the order of his

26  deportation, which were obtained from a search of his A-file. See Garcia-Beltran, 389 F.3d at 868 ("Other

27  evidence, of course may be suppressed...")(citing Gonzalez-Rivera v. INS, 22 F.3d 1441, 1444, 1452 (9th

28  Cir. 1994)) (upholding IJ's ruling granting motion to suppress I-213 form and officer's testimony

concerning what he learned from the stop). See also United States v. Del Toro Gudino, 376 F.3d 997, 1001

(9th Cir. 2004) (noting that evidence other than identity may, of course, be suppressed).

**C. The Court Should Preclude Any In-Court Identification of Mr. Rivera or Identification Testimony, or Alternantively Grant an EvidentiaryHearing.**

Mr. Rivera moves to exclude any in-court identification of him by the arresting officers as the fruit

of an unconstitutional stop. Alternatively, Mr. Rivera requests an evidentiary hearing outside the presence

of the jury to determine whether any of the government's evidence is tainted by the illegal stop.

"[T]he exclusionary sanction applies to any "fruits" of a constitutional violation--whether such

evidence be tangible, physical material actually seized in an illegal search, items observed or words

overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during

an illegal arrest and detention." United States v. Crews, 445 U.S. 463, 471 (1980). Identification evidence

is also inadmissible where it is obtained as a fruit of an unlawful seizure. United States v. Chamberlin, 644

F.2d 1262 (9th Cir. 1980) ("we hold that the identification evidence must be excluded as fruit of the

unlawful detention."). In-court identifications, as well as photographic and lineup identifications, may be

excluded where the in-court identification is tainted by the illegal stop. See Crews, 445 U.S. at 472-73; see

also Chamberlin, 644 F.2d at 1268 ("it is apparent that the opportunity to observe his demeanor was

brought about only because of his illegal detention, and thus must be excluded as an exploitation of his

illegal arrest"). "The focus is on the causal connection between the illegality and the evidence; and, the

burden of showing admissibility rest on the prosecution." Chamberlin, 644 F.2d at 1269. The prosecution

has failed to meet its burden in this case. Thus, Mr. Rivera respectfully requests that the Court preclude

any in-court identification of him. Alternatively, Mr. Rivera requests that an evidentiary hearing be held

to determine the basis for any in-court identification or identification testimony.

///

///

///

///

///

**V.**

**THE COURT MUST SUPPRESS MR. RIVERA'S ALLEGED PRE-MIRANDA FIELD STATEMENTS BECAUSE THEY WERE ELICITED AS A RESULT OF CUSTODIAL INTERROGATION.**

The material produced thus far by the government indicates that Agent Matta first confronted and interrogated Mr. Rivera, regarding his immigration status, by the side of Highway 94, two miles north of the International Border. This entire interrogation proceeded any form of administration of Miranda rights by the agents by approximately five hours.

"The ruling in Miranda prohibits 'custodial interrogation' unless the government first gives warnings to the [subject of the interrogation]." United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir. 1990). Custodial interrogation occurs when under the totality of the circumstances the questions asked by the police are reasonably likely to elicit an incriminating response from the subject. Id. Although questions that include routine biographical information usually do not trigger the safeguard of Miranda v. Arizona, "[t]hat exception is inapplicable . . . where the elicitation of information regarding immigration status is reasonably likely to inculpate the [subject]." Id.

In United States v. Kim, 292 F.3d 971, 973 (9th Cir. 2002),[11] the Ninth Circuit noted that the following factors are to be considered in deciding whether or not a police-dominated atmosphere exists: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Id. (citations omitted); see also United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980) (in context of custody at the border "[t]he factors to be weighed are the language used to summon him, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the pressure exerted to detain him."). The Ninth Circuit also recognizes that "question[s] implying that [the agent] suspected [the defendant] of

---

[11] In Kim, the Ninth Circuit found that a Korean woman who went to her own store, voluntarily, because an officer's visit prompted her to do so was in custody even though she was in familiar surroundings because the police "temporarily took over complete control of Kim's store creating a 'police-dominated atmosphere.'" 292 F.3d at 977. This combined with difficulty with English and isolation from family supported the finding that Kim did not willingly agree to submit to an encounter with the police. Id.

1    criminal activity" can give rise to a reasonable belief that one is not free to ignore the questions and leave.

2    United States v. Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).[12]

3         It is not necessary that an individual be physically restrained in any fashion. In Beraun-Panez, the

4    Ninth Circuit found that an individual questioned out in an open field, who was neither held nor handcuffed

5    nor told that he was under arrest, was nonetheless in custody for Miranda purposes.  Beraun-Panez held that

6    "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding."

7    812 F.2d at 580.[13]

8         Here, the criteria for a police-dominated atmosphere as articulated in Kim are clearly met.  Agent

9    Matta was in uniform, carrying his gun, and Mr. Rivera was a pedestrian in an isolated area.  Agent Matta

10   identified himself as a border patrol agent and prevented Mr. Rivera from continuing on his way indicating

11   to Mr. Rivera that he was in custody.  Mr. Rivera reasonably did not feel free to leave.

12        Concerning the extent to which Mr. Rivera was confronted with guilt, he was apprehended and

13   immediately interrogated about his immigration status.   Agent Matta confronted and interrogated Mr.

14   Rivera regarding his suspected criminal activity of being unlawfully present in the United States without

15   the benefit of Miranda warnings.  Thus, the statements must be suppressed.

16        Not only did the questioning here occur in a "police-dominated atmosphere" where Mr. Rivera was

17   isolated, the agent's questioning bore on Mr. Rivera's alienage, which is an element of the charged offense,

18   8 U.S.C. § 1326.  See United States v. Meza-Soria, 935 F.2d 166, 171 (9th Cir. 1991).  This question in

19   such a setting carried with it implicit suspicion of criminal activity. A person, such as Mr. Rivera subjected

20   to such questioning in such a situation obviously does not reasonably feel free to leave, and thus is subject

21   to custodial interrogation.  See Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).

22        In the context of an encounter between border patrol and an individual near the international border,

23   any questioning regarding an individual's alienage falls under the rubric of custodial interrogation.

24   Furthermore, because of the close relationship between civil and criminal immigration investigations,

25   "[c]ivil as well as criminal interrogation of in-custody defendants by INS [agents] should generally be

26

27        [3] Chavez-Valenzuela involved a roadside stop of a motorist on a public street, out in the open.

28        [4] The police confronted Beraun-Panez with his alienage, accused him of lying and kept him
     separated from his co-worker in a remote rural area.  Beraun-Panez, 812 F.2d at 580.

1   accompanied by the Miranda warnings." United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir.

2   1983).

3        In United States v. Gonzalez-Sandoval, 894 F.2d at 1043 (9th Cir. 1990), the defendant appeared at

4   a local police station to provide his state parole officer with a urine sample. Id. at 1046. A second parole

5   officer accused Mr. Gonzalez-Sandoval of being a deported alien and called the Border Patrol. Id. The

6   Border Patrol came to the station, and without warning him pursuant to Miranda, asked Mr.Gonzalez-

7   Sandoval where he was born and whether he possessed documents to verify the legality of his presence in

8   the United States. Id. The Border Patrol agents then took Mr. Gonzalez-Sandoval to the Calexico Border

9   Patrol Station. Failing to administer the Miranda warnings a second time, the agents questioned Mr.

10  Gonzalez-Sandoval about any alias he possessed. Id. The agents ran an INS record check against Mr.

11  Gonzalez-Sandoval's name and alias, and found Mr. Gonzalez-Sandoval's prior immigration record. Id.

12  The Ninth Circuit found that the district court erred in failing to suppress the unwarned, prompted

13  statements by Mr. Gonzalez-Sandoval about his name and alias. Id. at 1047.

14       In United States v. Mata-Abundiz, an INS agent visited the defendant in a state jail to obtain

15  biographical information to determine the defendant's citizenship status. 717 F.2d at 1278. The agent knew

16  about the state charges against Mr. Mata-Abundiz, and did not warn him pursuant to Miranda prior to

17  obtaining the biographical data. Id. Afterwards, the agent made further inquiries at his office and within

18  three hours returned to the jail to charge Mr. Mata-Abundiz with a federal immigration offense. Id. Despite

19  the fact that the agent characterized his interrogation as pursuant to a civil investigation, the court held that

20  the agent should have warned Mr. Mata-Abundiz as required by Miranda because the agent knew his

21  interrogation could lead to federal charges against the defendant. Id. at 1278-1279.

22       Here, it is obvious that the information the agent elicited from Mr. Rivera, during the interrogation,

23  regarding his citizenship, application for permission to enter, and use of a document was "reasonably likely

24  to inculpate" him. The questions served no purpose other than inculpation. They are in fact two of the four

25  elements that they government must prove to obtain a conviction for a violation of 8 U.S.C. § 1326.

26  Moreover, it is undisputed that Mr. Rivera was not read his Miranda rights at that point, nor advised that

27  his answers to the agent's questions could result in federal charges against him. Therefore, statements must

28  be suppressed.

**C.    Mr. Rivera's Statements Must Be Suppressed Because They Were Involuntary.**

Even when the procedural safeguards of <u>Miranda</u> have been satisfied, a defendant in a criminal case is deprived of due process of law if the conviction is founded upon an involuntary confession. <u>Arizona v. Fulminante</u>, 499 U.S. 279 (1991); <u>Jackson v. Denno</u>, 378 U.S. 368, 387 (1964). The government bears the burden of proving by a preponderance of the evidence that a confession is voluntary. <u>Lego v. Twomey</u>, 404 U.S. 477, 483 (1972).

In order to be voluntary, a statement must be the product of a rational intellect and free will. <u>Blackburn v. Alabama</u>, 361 U.S. 199, 208 (1960). In determining whether a defendant's will was overborne in a particular case, the totality of the circumstances must be considered. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973). Some factors taken into account have included the youth of the accused, his lack of education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. <u>Id.</u>

A confession is deemed involuntary whether coerced by physical intimidation or psychological pressure. <u>Townsend v. Sain</u>, 372 U.S. 293, 307 (1962). "The test is whether the confession was `extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" <u>Hutto v. Ross</u>, 429 U.S. 28, 30 (1976) (<u>quoting</u> <u>Bram v. United States</u>, 168 U.S. 532, 542-43 (1897)). <u>Accord</u>, <u>United States v. Tingle</u>, 658 F.2d 1332, 1335 (9th Cir. 1981).

Until the government meets its burden of showing all statements of the defendant that it intends to use at trial were voluntary, all statements -- even those taken before he was in "custody" -- must be suppressed as involuntary.

**D.    Mr. Rivera Requests That This Court Conduct An Evidentiary Hearing.**

This Court must make a factual determination as to whether a statement was voluntarily given prior to its admission into evidence. 18 U.S.C. § 3501(a). Where a factual determination is required, courts are obligated by Fed. R. Crim. P. 12 to make factual findings. <u>See</u> <u>United States v. Prieto-Villa</u>, 910 F.2d 601,

606-10 (9th Cir. 1990).  Because "'suppression hearings are often as important as the trial itself,'" id. at 609-10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.

Under section 3501(b), this Court must consider various enumerated factors in making the voluntariness determination, including whether the defendant understood the nature of the charges against his and whether she understood his rights.  Without the presentation of evidence, this Court cannot adequately consider these statutorily mandated factors. Mr. Rivera accordingly requests that this Court conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence  of the jury, whether any and all statements made by him were voluntary.

## V.

## MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

Defense counsel has received twenty-six pages of discovery at this time, however investigation of this case is not complete.  As defense counsel has not yet had an opportunity to inspect Mr. Rivera's A-file, Mr. Rivera specifically requests leave to file a motion challenging his deportation.  Also, information that comes to light as a result of further investigation may necessitate the filing of additional motions. Therefore, counsel requests leave to file additional motions once investigation is completed.

## VI.

## CONCLUSION

For the reasons stated above, Mr. Rivera respectfully requests that this Court grant the foregoing motions.

Respectfully submitted,


Dated:  June 9, 2008                    /s/ Sara M. Peloquin
                                        **SARA M. PELOQUIN**
                                        Federal Defenders of San Diego, Inc.
                                        Attorneys for Mr. Rivera

1

2

# **CERTIFICATE OF SERVICE**

3

4        Counsel for Defendant certifies that the foregoing is true and accurate to the best information and

5 belief, and that a copy of the foregoing document has been caused to be delivered this day upon:

6        Courtesy Copy to Chambers

7        Copy to Assistant U.S. Attorney via ECF NEF

8

9        Copy to Defendant

10

11 Dated:  June 9, 2008                    */s/ SARA M. PELOQUIN*

12                                          Federal Defenders of San Diego, Inc.

13                                          225 Broadway, Suite 900

14                                          San Diego, CA  92101-5030

15                                          (619) 234-8467  (tel)

16                                          (619) 687-2666  (fax)

17                                          Sara_Peloquin@fd.org (email)

18

19

20

21

22

23

24

25

26

27

28